# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| MARLIN SLADE CHAPPELLE )  | |
| ) | |
|      **Plaintiff,**      ) | |
| ) | |
| **v.**   ) | |
| ) | **CASE NO. 2:12-CV-2058-SLB** |
| CITY OF LEEDS; R. ERIC ) | |
| PATTERSON; JULIUS A. PIERCE, ) | |
| ) | |
|      **Defendants.**    ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on Defendant Patterson's Motion for Summary Judgment, (doc. 41),[1] and Motion for Partial Summary Judgment, (doc. 46), filed by defendants, the City of Leeds, Alabama, and Julius A. Pierce. Defendants also filed a Joint Supplement to their Motions for Summary Judgment, (doc. 80). Plaintiff Marlin Slade Chappelle has sued his former employer, defendant City of Leeds, and Leeds Mayor R. Eric Patterson, and its Fire Chief, Julius A. Pierce, alleging that defendants retaliated against him based on his protected activity. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendants' Motions for Summary Judgment, (docs. 41 and 46), are due to be granted as to Counts I and II of Chappelle's Amended Complaint, (doc. 23),

---

[1]Reference to a document number, ["Doc. ____"], refers to the number assigned to each document as it is filed in the court's record. Citations to page numbers refer to the page numbers assigned to each document in the court's electronic filing system.

and those claims will be dismissed with prejudice.  Count III will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> > (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

2

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II.  STATEMENT OF FACTS

Because the court finds that Chappelle's termination claims are precluded, the relevant facts are those surrounding the state administrative and court proceedings following his termination.

On May 23, 2010, Chappelle received a Notice to Employee of Contemplated Disciplinary Action from defendant Allen Pierce, the City of Leeds Fire Chief. (Doc. 54-6.) This Notice stated that the City was contemplating discipline "based on violation of the following rules and regulations: . . . [1] JCPB [Jefferson County Personnel Board] Rule 12.2(c) – conduct unbecoming a classified employee; [2] JCPB Rule 12.2(h) – insubordination; [3] JCPB Rule 12.2(j) – neglect of duty; [and]

3

JCPB Rule 12.2(l) – violation of a rule of the Appointing Authority, namely Rule N – Unsatisfactory

Performance or Conduct and Rule H – insubordination or other disrespectful conduct."  (*Id.* at 1.)

The Notice outlined the following conduct as grounds for the asserted rule violations:

> FF [Firefighter] Chappelle complained [to several employees] about being asked (along with several other firefighters) to cut the grass . . . when he was given that order by his superior.  He made the statement that the order was "punishment work" because Chief Pierce, Capt. Fulmer and Lt. Parsons did not like him.

> FF Chappelle was given a written reprimand on 5/14/10 for failing to ensure that the medication box on the fire truck was stocked adequately and that any out of date drugs were replaced.  He was disciplined along with several other employees who shared in this responsibility.  During his disciplinary meeting, FF Chappelle became argumentative about the reason for the reprimand and verbally abusive to his superior officer, Lt. Parsons.  FF Chappelle stated to Lt. Parsons, "Look at me when I'm talking to you."  This statement was made in front of Lt. Hicks and Capt. Fulmer.

> On May 14, FF Chappelle responded to a fire at a home, along with several other firefighters.  During the entire time that FF Chappelle and the other firefighters were on the scene, FF Chappelle sat in his vehicle and failed to assist in any way with responding to the call.

> FF Chappelle has stated to several other firefighters that Chief Pierce violated state competitive bid laws in connection with the purchase of a fire truck (Engine 3).  He stated that Chief Pierce "stole" the bid from the Palmerdale Fire District.  The purchase of this truck was handled through the competitive bid process and the allegations by FF Chappelle have no basis in fact or logic.

> FF Chappelle has stated to another firefighter that Chief Pierce has no clue how to run a fire department.

> Upon learning from another firefighter, while at the [JCPB] and in the vicinity of others, that he was being moved to a different station along with several other firefighters, FF Chappelle stated[,] "Them f - - - ing people are crazy!"  He also stated[,] "I hope they promote me to AO because if so I'm gonna make life hell."

> Several firefighters have expressed that FF Chappelle's constant complaints, accusations and threats of retaliation for perceived slights against him have made their working environment "miserable," "make for a long day," and cause them to fear for their safety and the safety of their co-workers.

(*Id*. at 1-2.)

A hearing was held before defendant R. Eric Patterson, Mayor of the City of Leeds, after which Patterson found Chappelle guilty of the alleged rule violations, except Rule 12.2(j), neglect of duty.  (Doc. 54-7 at 1, 3.)  Patterson found:

> After hearing . . . testimony, it is my finding that Firefighter Chappelle has been repeatedly disrespectful to his superior officers and is biased against his superior officers.  These issues are evidenced by his insubordinate attitude and his anger and contempt toward them.  Firefighter Chappelle's (1) admissions of making negative comments about Fire Chief Pierce and (2) inappropriate communication of Fire Chief Pierce's alleged violation of bid laws and his insistence that the Fire Chief would get in trouble are further evidence of his contempt and disdain for the Fire Chief. Firefighter Chappelle's (1) negative attitude toward Fire Department and City policies, (2) conveyance of those negative attitudes to otherwise satisfied Firefighters and (3) negative attitude to Firefighters who do not share his antagonism all evidence an intense determination to undermine authority  and the chain of command.  Four (4) different Firefighters have no apparent common bond except they all work for the City of Leeds Fire Department.  Moreover, every incident occurred at a different time and place.
>
> Due to the nature of the job and the importance of the chain of command as it relates to safety, the types of insubordination and constant undermining of the chain of command as herein described cannot be tolerated.  . . .

(*Id*. at 3.)  Chappelle was terminated effective June 7, 2010.  (*Id*. at 1.)

Chappelle appealed his termination to the Jefferson County Personnel Board.  The Board appointed a hearing officer, who conduct a hearing that included witness testimony and exhibits.

5

Following the hearing, the Hearing Officer issued his Findings of Fact and Recommendation.  (*See*

doc, 58-2 at 2.)  In his Findings of Fact, the Hearing Officer found:

> • Chappelle had been a Firefighter/Paramedic with the City for ten years prior
> to his termination on June 7, 2010.  (*Id*. at 2-3.)

> • Chappelle had refused a direct order from his superior, Lt. Leon Embry,
> and, in doing so, he told Embry that he "could write him up if he wished to do so."
> (*Id*. at 6.)   The Hearing Officer found that "Chappelle's behavior . . . was
> unacceptable."  (*Id*. [footnote omitted].)

> • Capt. Mark Musgrove suspended Chappelle for one day for
> insubordination.  (*Id*. at 7.)  Musgrove had ordered Chappelle to move his car from
> a favored parking space and, "when Chappelle asked[, 'W]hy[,'] Capt. Musgrove
> replied 'because I told you to'."  (*Id*.)  Musgrove moved his car into the favored
> space after he suspended Chappelle and told him to leave the station.  (*Id*. at 8.)  The
> Hearing Officer found "Musgrove and Chappelle were never fans of each other," and
> he found that this "animus . . . appears to stem from an incident where Chappelle told
> the Mayor of the City of Leeds that Capt. Musgrove was operating a real estate
> business on fire department time."  (*Id*. at 7.)  The Hearing Officer concluded,
> "Chappelle should not have received a disciplinary suspension for this incident
> because it appears more likely than not that Capt. Musgrove was using his authority
> over him in an improper manner."  (*Id*. at 8.)

> • On April 7, 2010, while Chappelle and a fellow firefighter Andy Martin
> were taking a promotional exam, Martin told Chappelle that he was to be transferred
> to Fire Station 1.  (*Id*.)  Martin testified that Chappelle "became irate" and that he
> "threatened to make life hell for the other firefighters, spoke critically of the Fire
> Department Administration, threatened to take Chief Pierce down, and threatened
> to contact the Attorney General's office to file a complaint against Chief Pierce for
> violating the state bid laws."  (*Id*. at 8-9.)  Although Martin reported the incident to
> his superiors, Chappelle was not disciplined for these statements.  (*Id*. at 9.)

> • On May 10, 2010, Chappelle and Firefighter Josh Davis were assigned to
> mow the grass.  (*Id*. at 10.)  Davis stated that Chappelle had complained about the
> assignment and had told Davis "it was punishment work."  (*Id*.)  Davis reported
> Chappelle's comments to Capt. Fulmer; however, Chappelle was not disciplined for

his comments to Davis.  (*Id*.)  The Hearing Officer found that "it was Lt. Muser [his supervisor] who actually complained about the grass[-]cutting incident," and that "Lt. Muser was subsequently disciplined for his complaints."  (*Id*.)

• Firefighter Josh Davis testified that Chappelle "constantly made disparaging remarks about fire department administration," and that he had accused Davis of "trad[ing] sexual favors in order to get ahead in the department."  (*Id*. at 10).  Although the Hearing Officer found that Davis had not reported these comments to his superiors, he found "it is more likely than not that Chappelle made the statements attributable to him."  (*Id*. at 10-11.)

• On May 5, 2010, expired drugs were found on the Rescue Truck.  (*Id*. at 11.)  Four paramedics, including Chappelle, had worked on the truck between the date the drugs expired, May 1, 2010, and the date the expired drugs were discovered, May 5, 2010.  (*Id*.)  All four paramedics were issued a written discipline.  (*Id*.)

• The Hearing Officer found that Chappelle had filed two EEOC Charges (September 2009 and April 2010).  (*Id*. at 16.)  He also found, "Just days before his disciplinary meeting on May 14, 2010, Chappelle delivered a letter to the Mayor and City Council outlining his opposition to and reporting discrimination against Ashley Graves."  (*Id*.)

• Chappelle met with Lt. Chuck Parsons, Capt. Scott Fulmer, and Lt. Leo Hicks regarding his discipline for the expired drugs on May 14, 2010.  (*Id*.)  The parties disputed whether Chappelle was disrespectful, angry, and/or loud during this meeting.  (*Id*. at 11-12.)  Hicks testified that Chappelle was not insubordinate or disrespectful during the meeting.  (*Id*. at 12.)  Chappelle contended that the discipline was directed at him and that he should not have been disciplined because he reported the expired drugs.  (*Id*.)

• Chappelle did "not identif[y] any similarly[-]situated co-employees."  (*Id*. at 16.)

• The Hearing Officer found, "The temporal proximity between Chappelle's protected activity [–] the second EEOC charge and his sending of the letter to city officials [–] and his termination raises an inference that the two events are not unrelated."  (*Id*. at 17 [citation omitted].)

7

Based on these Findings of Fact, the Hearing Officer found in Chappelle's favor, stating that "it appears more likely than not that Chappelle was retaliated against for engaging in protected activity."

(*Id*. at 18.)  He specifically stated:

> Based on the evidence, it is clear that there was internal strife between Chappelle and some of his superiors at the City of Leeds Fire Department.  It is also clear that Chappelle had strong opinions that he expressed to co-workers about the administration of the City of Leeds Fire Department.  However, Chappelle was never written up regarding any of the inflammatory comments attributed to him.

> Before his termination, Chappelle was formally disciplined on two occasions: once by Lt. Embry [the refusal to enter data into the computer] and once by Cpt. Musgrove [the refusal to move his car].  Chappelle should not have been disciplined regarding the Capt. Musgrove incident because of Capt. Musgrove's improper behavior.

> There is conflicting testimony about how Chappelle conducted himself at the meeting that was the "final straw" before his termination.  Lt. Parsons and Capt. Fulmer state that Chappelle was disrespectful[;] Lt. Hicks and Chappelle state that he was not.  Lt. Hicks's testimony in this regard is the most believable as he was there as a disinterested witness.

> Chappelle was afforded due process meaning his rights were protected.  There is no evidence that similarly[-]situated employees were treated more favorably than Chappelle.

> However, it appears more likely than not that Chappelle was retaliated for engaging in protected activity.

(*Id*. at 17-18.)

Following this decision, the City filed Objections to Findings of Fact and Recommendation to the Personnel Board.  (Doc. 81-5.)  In these Objections, the City argued, *inter alia*, –

• "[T]he Hearing Officer ignored critical evidence in finding that Chappelle was not disrespectful or insubordinate during the disciplinary meeting." (*Id*. at 10.) The City argued:

> Leeds submitted a tape recoding of this meeting, and both parties submitted typed transcripts of that meeting, which were very similar in content. The Hearing Officer ignores the transcripts which show that Chappelle was blatantly disrespectful. The Hearing Officer ignores the tape on which the angry and argumentative tone of Chappelle's voice can be clearly heard. Further, Chappelle and Hicks admitted that the statements attributed to Chappelle in the transcript were made by Chappelle (i.e., Chappelle admits he stated to Parsons, "Look at me when you're talking to me now) but contended that there was no disrespect. The Hearing Officer credited Lt. Hicks'[s] testimony in this regard despite the evidence of Hicks'[s] long-standing friendship with Chappelle, his history of coming to Chappelle's defense whenever an issue arose, and his bias against the administration of the Fire Department as demonstrated by his past grievances and claims. The Hearing Officer notes that another employee who was disciplined for the drug-box incident, Kyle Shell, testified that Lt. Parsons told him that the warning was aimed at Chappelle, but fails to include the fact that Lt. Parsons denied making this statement. Nor does the Hearing Officer explain why he credited Shell over Parsons, and ignored Shell's bias against Leeds as reflected by a complaint he lodged over discipline that he received for discriminatory conduct. The Hearing Officer's finding that Chappelle was not disrespectful at the drug-box disciplinary meeting ignores the substantial evidence to the contrary . . . .

(*Id*. at 10-11.)

• "[T]he proximity argument is faulty with regards to Chappelle's May 10 letter to the Mayor, which the Hearing Officer points to as protected conduct for which Chappelle was retaliated, because it did not precede the decision to discipline Chappelle for the drug-box incident." (*Id*. at 11.) According to the City, the decision to discipline the paramedics was made shortly after May 5, 2010. (*Id*.) The City was unable to give Chappelle a written warning for the incident because Chappelle was off work on May 6-7, Parsons was off work on May 8, and on May 11, Chappelle's next scheduled day of work, he called in sick. (*Id*. at 12.) Therefore,

the City argued, "Before he reported back to work and before he could be disciplined, Chappelle mailed an 'insurance' letter to Mayor Patterson." (*Id*.)

• With regard to Musgrove's decision to suspend Chappelle for failing to move his car, the City argued, "The conduct of Chappelle [was] undisputed – he disobeyed a direct order in the presence of other firefighters." (Doc. 81-5 at 4-5 [original emphasis deleted].) The City argues this finding is inconsistent with the Hearing Officer's finding that Chappelle's failure to follow another order, the one from Embry, was unacceptable. (*Id*. at 5.)

• The City disagreed with the Hearing Officer's finding that Chappelle had not been disciplined for the incidents of April 7, 2010, and April 20, 2010, because these incidents were actually part of the Notice preceding his termination. (*Id*. at 7.) The City argued, "[I]n the Notice of Termination, the Mayor found that there was cause to terminate Chappelle's employment based – in part – on the events occurring on those dates. It is clear that Chappelle wasn't terminated just for the final incident, but that all of these incidents which occurred within weeks of the Notice of Contemplated Disciplinary Action were the basis for the termination." (*Id*.)

• The City argued that the Hearing Officer should not have considered the issue of whether Chappelle should have been disciplined for the expired drugs on the rescue Truck because "Chappelle was not terminated for the expired medications being on the Rescue Truck; he was terminated, in part, because of his behavior in response to the written warning for the drug box incident." (*Id*. at 9-10.) Also, it contended, "It is clear that the Hearing Officer's disagreement with the Chief's decision to warn all personnel involved in this incident improperly factored into his finding that Chappelle's termination was retaliatory." (*Id*.)

On review, the Personnel Board rejected the Hearing Officer's Report and Recommendation, stating, "The Board disagrees with the finding that it is more likely than not that the disciplinary action was in retaliation for protected activity. The Board finds that Respondent Chappelle was terminated for legitimate non-retaliatory reasons – insubordination, disrespectful conduct, conduct unbecoming a classified employee and unsatisfactory behavior or performance." (Doc. 81-6 at 2.)

Chappelle filed an appeal of the decision of the Personnel Board in the Circuit Court of Jefferson County. (*See generally* doc. 81-7.) In his Complaint and Notice of Appeal, which named the Personnel Board and the Fire Department as defendants, (*id*. at 2), Chappelle alleged:

3. . . . A lengthy report was filed by the hearing officer, finding that termination of plaintiff was not justified under the facts presented. His recommendation was filed January 18, 2012.

4. The Board, however, after a brief argument, wherein uniformed Leeds firefighters [and] police officers [were present and] introduced by defendant, issued [its] Order terminating plaintiff.

5. The next thing to occur was the issuance of the Order reversing the hearing officer's opinion and reinstating the termination of plaintiff. Strangely enough, the Board did not issue in writing its reasons for reversing the hearing officer. . . . Such action is in violation of plaintiff's statutory and constitutional rights to substantive and procedural due process.

6. The ruling of the Board is illegal, unconstitutional and contrary to state and federal law, violating the rights of plaintiff in the additional ways:

(A) The said ruling is erroneous as a matter of law and is not supported by substantial evidence. It is against the preponderance of the evidence and the great weight of the evidence, being arbitrary and unjust and palpably wrong.

(B) The said decision is in violation of plaintiff's constitutional rights, being based on vague and uncertain charges which do not apprise plaintiff of the allegations he was to defend. Vague standards were applied which resulted in his termination.

(C) The Board was arbitrary and capricious in its ruling in that it heard only limited evidence from defendant and did not have a transcript of the entire proceedings upon which to base its decision, not giving plaintiff nor his counsel adequate opportunity to argue or present its case.

(D)   The decision is not based on substantial evidence, and is the product of prejudice in that illegal and improper evidence was allowed to be considered.  Such evidence includes the argument of lawyers as though they were under oath or factual.

(E)   Plaintiff pleads that he is not guilty of any offense which would merit such discipline.  The [Fire Department] and the Board have not set and have not followed any standards for discipline, and plaintiff was arbitrarily and capriciously punished, whereas others similarly situated or accused of similar or far worse matters have been treated more leniently and plaintiff was the victim [of] retaliation.

7.   Plaintiff would request that a transcript of the proceedings in the Personnel Board be sent to the Clerk of the Court, and that the matter be reviewed in accordance with law, and that the termination of employment be voided and that he be reinstated with all back benefits.  . . .

(Doc. 81-7 at 3-4.)

On June 1, 2012, while his appeal was pending in the Circuit Court of Jefferson County, Chappelle filed the instant action against the City and Patterson, alleging he was terminated in retaliation for activity protected by Title VII and the First Amendment.  (*See generally* doc. 1.)  He also alleged, "Defendants [had] failed to compensate Plaintiff in accordance with applicable law, procedures, and City policy."  (*Id*. ¶ 70.)  He later amended his Complaint to assert claims against Pierce.

A three-judge panel of the Circuit Court of Jefferson County heard Chappelle's appeal.  (*See* doc. 81-8.)  On May 5, 2014, the panel issued its Order, in which it noted that its review was "limited to a determination of whether there [was] substantial evidence in the administrative record to support the decision of the Jefferson County Personnel Board."  (*Id*. [citing Section 22, Enabling Act of the Personnel Board of Jefferson County, as amended].)  Based on its review of the

administrative record and the arguments of the parties' counsel, the panel affirmed the decision of the

Board.  (*Id*.)

Chappelle filed a writ of certiorari with the Alabama Court of Civil Appeals,[2] which affirmed

the Circuit Court without opinion.  (Doc. 81-11.)  Thereafter, he filed a writ of certiorari with the

Alabama Supreme Court, which was denied without opinion.  (Doc. 81-13.)

## III.  DISCUSSION

### A.  COLLATERAL ESTOPPEL[3]

The dispositive issue before this court is whether Chappelle's claims are precluded by the

state-court judgment.  As the Supreme Court has noted:

> [T]he federal courts consistently have applied res judicata and collateral
> estoppel to causes of action and issues decided by state courts.  Indeed, . . . this
> Court has consistently emphasized the importance of the related doctrines of res
> judicata and collateral estoppel in fulfilling the purpose for which civil courts had been
> established, the conclusive resolution of disputes within their jurisdiction.  Under res
> judicata, a final judgment on the merits of an action precludes the parties or their
> privies from relitigating issues that were or could have been raised in that action.
> Under collateral estoppel, once a court decides an issue of fact or law necessary to
> its judgment, that decision precludes relitigation of the same issue on a different cause
> of action between the same parties.  Thus, invocation of res judicata and collateral
> estoppel relieves parties of the cost and vexation of multiple lawsuits, conserves
> judicial resources, and, by preventing inconsistent decisions, encourages reliance on
> adjudication.  When a state court has adjudicated a claim or issue, these doctrines

---

[2]Chappelle filed his writ with the Alabama Supreme Court, which transferred the case to the
Court of Civil Appeals.  (Doc. 81-10.)

[3]Because the court finds that Counts I and II of Chappelle's Amended Complaint are issue
precluded, the court will not address whether these claims are also claim precluded.

also serve to promote the comity between state and federal courts that has been recognized as a bulwark of the federal system.

*Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 467 n.6 (1982)(internal citations and quotations omitted).  More recently, the Court has held:

> Once a court has decided an issue, it is "forever settled as between the parties," *Baldwin v. Iowa State Traveling Men's Assn.*, 283 U.S. 522, 525, 51 S. Ct. 517, 75 L. Ed. 1244 (1931), thereby "protect[ing]" against "the expense and vexation attending multiple lawsuits, conserv[ing] judicial resources, and foster[ing] reliance on judicial action by minimizing the possibility of inconsistent verdicts," *Montana v. United States*, 440 U.S. 147, 153-154, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979). In short, "a losing litigant deserves no rematch after a defeat fairly suffered." *Astoria Fed. Sav. & Loan Assn. v. Solimino*, 501 U.S. 104, 107, 111 S. Ct. 2166, 115 L. Ed. 2d 96 (1991).

*B & B Hardware, Inc. v. Hargis Industries, Inc.*, 135 S. Ct. 1293, 1302-03 (2015).

With these general principals in mind the court turns to the specific circumstances of the instant action.

Alabama law governs for purposes of the collateral estoppel/issue preclusion analysis. *See Cmty. State Bank v. Strong*, 651 F.3d 1241, 1263 (11th Cir. 2011). "[I]ssue preclusion precludes the re-adjudication of the ***same issue***, where the issue was actually litigated and decided in the previous adjudication, even if it arises in the context of a different cause of action." *Id*. at 1263-64.

Under Alabama law, the doctrine of collateral estoppel applies when the following elements are established: "(1) that an issue in a prior action was identical to the issue litigated in the present action; (2) that the issue was actually litigated in the prior action; (3) that resolution of the issue was necessary to the prior judgment; and (4) that the same parties [or their privies] are involved in the two actions." *Walker v. City of Huntsville*, 62 So. 3d 474, 487 (Ala. 2010)(citations and internal quotation marks omitted); *see also Malfatti v. Bank of Am.*, 99 So. 3d 1221, 1225 (Ala.

14

2012)("For a prior judgment as to an issue to have a preclusive effect on a party's later relitigation of that issue, it must be shown that the person against whom the preclusive effect is sought, or a person in privity with that person, was a party to the prior litigation in which the issue was decided and that the issue for which preclusion is sought was actually litigated in the prior action." (Citations and internal quotation marks omitted.)).

See *Portis v. Bice*, Civil Action No. 2:12cv991-MHT, 2013 WL 4009156, *6 (M.D. Ala. Aug. 5, 2013). For the reasons set forth below, the court finds that Chappelle is precluded from litigating in this action the issue of whether he was terminated in retaliation for certain protected activity.

### 1. Same Parties or Their Privies

Chappelle contends that there is no privity between the parties in the instant action and the parties in the state-court proceedings. (*See* doc. 85 at 5.) The court disagrees.

The Alabama Supreme Court has held, "A number of decisions by this Court have indicated that the 'same parties' requirement is not strictly enforced if the party raising the defense of collateral estoppel, or the party against whom it is asserted, is in privity with a party to the prior action." *Dairyland Ins. Co. v. Jackson*, 566 So. 2d 723, 726 (Ala. 1990)(internal citations omitted).

In *Ex parte Flexible Products Co.,* 915 So. 2d 34 (Ala. 2005), this Court noted that the well established principle that "'[c]ollateral estoppel, also known as issue preclusion, is available as a defense to relitigation of an issue in a subsequent suit *between the same parties* which is not on the same cause of action.'" 915 So. 2d at 45 (quoting *Martin v. Reed,* 480 So. 2d 1180, 1182 (Ala. 1985) (emphasis added)). The Court, however, also noted that "the doctrine of mutuality of estoppel[, i.e., the requirement that the parties be identical,] may be satisfied by less than a perfect identity of the parties in the first and second actions, as when particular parties are in privity." *Ex parte Flexible Products Co.*, 915 So. 2d at 48. "The test for determining if two parties are in privity focuses on identity of interest." *Dairyland Ins. Co. v. Jackson*, 566 So. 2d 723, 726 (Ala. 1990)(citing *Alabama Farm*

15

*Bureau Mut. Cas. Ins. Co. v. Moore*, 349 So. 2d 1113, 1116 (Ala. 1977)). "'Privity' is a flexible legal term, comprising several different types of relationships and generally applying when a person, although not a party, has his interests adequately represented by someone with the same interests who is a party." *EEOC v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1286 (11th Cir. 2004)(citing *Hansberry v. Lee*, 311 U.S. 32, 41-43, 61 S. Ct. 115, 85 L. Ed. 22 (1940)).

*Jim Parker Bldg. Co., Inc. v. G & S Glass & Supply Co., Inc.*, 69 So. 3d 124, 132 (Ala. 2011). "It is settled that the party claiming the benefit of the prior judgment as an estoppel against the opposing party must be one who would have been prejudiced by a contrary decision in the prior case." *Dairyland Ins.*, 566 So. 2d at 727.

In this case, Chappelle contends that Patterson and Pierce were the decisionmakers who terminated him in retaliation for his protected activity. In the state court proceedings, Chappelle contended that he was terminated in retaliation for his protected activity or, in other words, that the decisionmakers, Patterson and Pierce, acted with a retaliatory motive. The adverse employment action alleged in both cases was termination and the protected activity in both cases was his letter to Patterson and his two EEOC charges. Therefore, under these circumstances, Patterson and Pierce are in privity with the City as their interests in upholding the termination decision were the same. *See Perry v. Alabama Beverage Control Bd.*, No. 2:11cv464-WHA, 2011 WL 4435263, *9 (M.D. Ala. Sept. 23, 2011)("Considering the mutuality of interests inherent in the employee employer relationship and the fact that the Plaintiffs are seeking redress for acts committed by the Defendant employees while they were acting in the scope of their employment with ABC, this court finds that the Defendant employees are in privity with the Defendant employer, ABC.").

Thus, the court finds that the state-court proceedings and the instant action involved the same parties.

## 2. Identical Issue

The issue in the state court proceedings was whether Chappelle was terminated in retaliation for his EEOC charges and/or his letter to Patterson and the City Council, or whether he was terminated for cause based on insubordination and disrespectful behavior.  Chappelle argues that the issues in these proceeding are not the same:

> The issues reviewed by the agency and the reviewing courts in the case below are not consistent with the issues raised by the Plaintiff in his First Amendment Retaliation claim before this Court.
>
> . . .
>
> The issue to be decided by the PBJC and reviewed by the Circuit Court concerned whether Plaintiff was terminated "for cause" under the Rules and Regulations of the Personnel Board of Jefferson County.  Accordingly, the underlying proceedings were to examine the "discrete issue" of whether there was "cause" under the Rules for Plaintiff's termination.
>
> In the First Amendment retaliation claim, however, there is a four-part test that is applied by the courts, to wit:
>
> 1)  whether the Plaintiff's speech was made as a citizen and whether it implicated a matter of public concern;
> 2)  if so, then whether the Plaintiff's interests outweigh the Defendant's interest in regulating his speech to promote the efficiency of the public services it performs through its employees;
> 3)  whether the Plaintiff has shown that the speech was a substantial motivating factor in his termination; and
> 4)  if so, then the burden shifts to the Defendant to prove it would have terminated Plaintiff even in the absence of his speech.

Thus, as clearly shown, the issue to be decided by the underlying agency is vastly different than the analysis of the issues in this Court. Moreover, such First Amendment analysis was not covered in the proceedings below.

In *Rawlinson v. Whitney Nat. Bank*, 416 F. Supp. 2d 1263, 1272-73 (M.D. Ala. 2005), the district court noted the difference between the issues to be considered in an unemployment hearing as opposed to a Title VII claim. The issue to be determined in the Title VII proceeding was whether race was a motivating factor, whereas the issue in the administrative proceeding was whether Plaintiff was "discharged for an actual or threatened deliberate act of misconduct committed in connection with the work after previous warning." *Id.*

The court held that a finding by the administrative agency on the discrete issue before it would not necessarily be determinative of the underlying discrimination claim. *Id.* at 1273. Likewise, a finding on the issue of "cause" for termination is not necessarily determinative of the underlying claim of First Amendment retaliation in the case *sub judice*.

. . .

The appeal from the ruling of the Personnel Board order hinged on the lack of fact-finding in its Order. Such fact-finding was a necessary pre-requisite to a proper determination and overturning of the Hearing Officer's Report and Recommendation. Thus, the appeal, and the oversight by the Circuit Court and later the Court of Civil Appeals, pertained to a procedural issue peculiar to the Personnel Board proceeding and did not pertain to the substantive issue of whether there was a First Amendment retaliation violation. Accordingly, on that basis as well, there is not an identity of issues.

(Doc. 85 at 6-8 [footnote and other internal citations omitted].) The court disagrees.

In the state administrative proceedings, Chappelle and the Fire Department argued over the reason Chappelle was terminated – whether his termination was in retaliation for his protected activity – the two EEOC charges and the letter to Patterson – or whether he was terminated for insubordination, disrespectful conduct, conduct unbecoming a classified employee, and unsatisfactory

behavior or performance.  The Hearing Officer found that it was more likely than not that the protected activity motivated Chappelle's termination; however, the Personnel Board disagreed and found Chappelle had been terminated for cause.  Chappelle appealed and the Circuit Court found that there was sufficient evidence to support the Personnel Board's decision.

Chappelle contends that the issue before this court is somehow different.  The court agrees that *other* findings may be necessary to support a decision that Chappelle was terminated in violation of the First Amendment and/or Title VII; nevertheless, a decision on either claim requires a finding that the decision-makers were motivated by retaliation.  *See University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2534 (2013) ("The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."); *Carter v. City of Melbourne*, 731 F.3d 1161, 1168 (11th Cir. 2013)(In establishing a claim of retaliation in violation of the First Amendment, plaintiff must prove that his "speech played a 'substantial part' in the government's decision to demote or discharge" him).  The court finds that the issue of the motivation behind Chappelle's termination, an issue in the instant action, is identical to the issue before the Personnel Board.

Therefore, the court finds that this prong of the collateral-estoppel is satisfied.

### 3.  Actually Litigated

Defendants argue:

19

[T]here can be no question that the issue to be estopped – i.e., whether Chappelle's termination constituted retaliation – was actually litigated during Chappelle's appeal proceedings.   Following the hearing and submission of the Hearing Officer's recommendation, the Board specifically found that Chappelle's termination was not retaliatory, but rather, was legitimately based on non-retaliatory reasons, including insubordination, disrespectful conduct, and conduct unbecoming a classified employee.   Furthermore, Chappelle's appeal to the three-judge panel in the Circuit Court of Jefferson County also litigated the issue of retaliation, with the panel ultimately affirming that "substantial evidence" supported the Board's conclusion that Chappelle's termination was non-retaliatory.

(Doc. 80 at 11-12 [internal citations omitted].)   In response, Chappelle contends, "The issues actually litigated in the *courts* below pertained to the lack of fact-finding by the Board in its Order. Accordingly, those issues . . . are issues that are far different than the issues that are before this Court. (Doc. 85 at 8-9 [emphasis added].)

Therefore, this court must decide whether an issue is precluded if that issue was actually litigated before an administrative agency acting in a judicial capacity and later affirmed by the state court based on a substantial-evidence review.   The law is clear:   "It is well established that judicial affirmance of an administrative determination is entitled to preclusive effect.   There is no requirement that judicial review must proceed *de novo* if it is to be preclusive."   *Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 480 n.21 (1982).

The issue of whether Chappelle's termination was motivated by retaliation was litigated before the Personnel Board and the decision of the Personnel Board was reviewed and affirmed by the Circuit Court pursuant to Alabama law.   It matters not that the Circuit Court's review was deferential, as required by Alabama law.   The Alabama courts rejected Chappelle's argument that

the fact-finding of the Personnel Board and its written Order were inadequate.  Moreover, the Circuit Court found substantial evidence supported the decision of the Personnel Board that Chappelle was not terminated in retaliation for his protected activity and he was terminated for cause.  This finding was affirmed by the appellate courts.

The court finds that the issue of whether Chappelle was terminated in retaliation for engaging in protected activity was actually litigated before the Personnel Board and that the Personnel Board's decision was reviewed by the state courts.

### 4. Necessary to Prior Judgment

Chappelle contends, "The issue of whether the termination was justified under the Jefferson County Personnel Board Rules is not necessarily determinative of whether Plaintiff was terminated due to his exercise of his First Amendment rights.  Since there are different standards that attach to the two tests which are entirely legally different, this factor also weighs in favor of Plaintiff."  (Doc. 85 at 9.)  The court disagrees.

Chappelle challenged his termination on the ground that the City had not terminated him for cause but had terminated him in retaliation for filing two EEOC charges and his letter to the Mayor and City Council.  The Hearing Officer found retaliation motivated the termination; the Personnel Board disagreed, finding the termination was based on cause and not retaliation.  Although the Personnel Board could have found only that the City had cause for Chappelle's termination, it actually found "Chappelle was terminated for legitimate ***non-retaliatory*** reasons . . . ."  (Doc. 81-6

[emphasis added].)  Clearly, a finding that Chappelle's termination was not motivated by retaliation was necessary to the decision that he was "terminated for . . . non-retaliatory reasons."

The court finds that the issue of whether Chappelle's termination was motivated by retaliation was necessary to the decision of the Personnel Board which was reviewed and affirmed by the state courts.

Therefore, based on the foregoing, the  court finds that Chappelle claims of retaliation in violation of Title VII and the First Amendment are precluded.  Therefore, defendants' Motions for Summary Judgment are due to be granted, and Counts I and II of plaintiff's Amended Complaint will be dismissed with prejudice.

## B.  BREACH OF CONTRACT

Chappelle's Amended Complaint contains a claim for breach of contract and "ministerial duties" arising from defendants' failure to pay him as a paramedic.  This claim is based on Alabama state law.

Section 1367(c)(3) provides, "The district courts may decline to exercise supplemental jurisdiction over a [state-law] claim . . . if . . . (3) the district court has dismissed all claims over which it has original jurisdiction . . . ."  28 U.S.C. § 1367(c)(3).  "Because no basis for original federal jurisdiction presently exists, the district court has the discretion to decline to exercise supplemental jurisdiction."  *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1123 (11th Cir. 2005)(citing 28 U.S.C. § 1367(c); *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271,

1288 (11th Cir.2002)).  *see also Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1353

(11th Cir. 1997).[4]  Indeed, "if the federal claims are dismissed prior to trial,[the Supreme Court]

strongly encourages or even requires dismissal of state claims."  *Mergens v. Dreyfoos*, 166 F.3d

1114, 1119 (11th Cir. 1999)(quoting *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d

414, 428 (11th Cir. 1984)(citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966))).

Because the court is dismissing Chappelle's two federal-question claims and the remaining

state-law claim between Alabama residents does not provide an independent basis for this court's

subbject-matter jurisdiction, the court declines to exercise supplemental jurisdiction over Count III

of plaintiff's Amended Complaint.  This claim will be dismissed without prejudice and plaintiff may

file this claim in state court.

---

[4]The *Baggett* court held:

> Resolution of Plaintiffs' state law claims depends on determinations of state law.  State courts, not federal courts, should be the final arbiters of state law.  When coupled with the Court's discretion to exercise supplemental jurisdiction under § 1367(c), this Court finds that the state law claims remaining in this action are best resolved by the Georgia courts.  This is especially true here where the Court is dismissing Plaintiffs' federal law claim prior to trial.  The Court finds that judicial economy, fairness, convenience, and comity dictate having these state law claims decided by the state courts.

*Baggett*, 117 F.3d at 1353 (citing, *inter alia*, *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *Eubanks v. Gerwen*, 40 F.3d 1157 (11th Cir.1994)).

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendants are entitled to judgment as a matter of law.  An Order, granting defendants' Motions for Summary Judgment, (docs. 41 and 46), as to Counts I and II, dismissing those claims with prejudice, and dismissing without prejudice Count III pursuant to 28 U.S.C. § 1367(c)(3), will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 29th day of September, 2015.


*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
SENIOR UNITED STATES DISTRICT JUDGE